United States Bank of America Bank of America, United States of America, United States Bank of America, United States Bank of America, that was the most direct comparison. The 7% was based upon an overall 1989 and 1990 average because citizens actually shrunk in 1989. If you look at the growth rate in his model, it was overall 7% for that time period. But 5% was the growth rate of the peers during the damages period that was sponsored by the government's own experts. So there's no dispute that 5% is minimum rates. Let me give a little bit of background. Citizens was a traditional mutual thrift based in Northwest Indiana. It was run by the same key managers for decades, had a long history of growth. Part of the findings though is that those managers were so conservative they wouldn't have invested this money anyway. They had an impressive record of steady profits and they were conservative in terms of credit risk and capital. They invested essentially in two types of assets, single family residential mortgage loans and mortgage related securities and similar investments. But they had a long history of growth. As I mentioned, they grew in 87, 89. Their pre-free of business plans called for them to at least grow by that same 5% over the next several years. And then the breach came along. It was a massive disruption to their business taking away 70% of its regulatory capital. It was well documented. The massive breach directly caused citizens to adopt and follow a no growth strategy. Instead of growing at the very least in accord with the past plans and performance and the growth that appears at 5 to 7%, citizens had to rebuild this capital. Let me address the first major legal error. Without citation to any authority, the court below required specific lost opportunities or transactions for citizens to prove causation of lost profits. That's not the law, nor can it be the law in the case of an ongoing high volume business whose losses are based upon hundreds of transactions like a shipping firm, a grocery store, car dealership, or a plain vanilla thrift like citizens. The ongoing high volume businesses conduct numerous transactions every day when the size or scope of their business is restricted. Why is that not typical though? Why is that not appropriate in a lost profits analysis? I mean, it seems to me that when the issue is when someone is coming in as they argue, we're not talking about a restitution case or a reliance case, we're talking about lost profits. Why is it not entirely appropriate to look at what possibilities were lost or not engaged in? It seems to make sense to me in a lost profits analysis. You'd almost have to do what I would think. This is not the case of an individual product or a business. The entire business is affected. The grocery store's business operations are restricted. It would have had many sales between customers of various types of products over a period. In these cases, because you have so many high volume transactions, you don't have to show the specific transactions you would have had that would have made up a little bit of profit that would have carried through the overall profit. These principles are applied in authorities cited at 63, Evergreen Brick, Mundell Manufacturing, 98 F30, 365, and 8th Circuit case. And in our reply at 14, Enright, MV, McCulloch's Right Hand, 10 F30, 1195, a 5th Circuit case. And Bob Willows Motors, 872 F2nd, 798, a 7th Circuit case. Citizens is just like the shipping firm or these other high volume based cases because they're taking in retail deposits from hundreds of customers. It's making residential mortgage loans to hundreds of customers, and it's buying mortgage-related securities and similar investments. A high volume business could virtually never meet a specificity test where you have to identify the specific loss transactions. That would only require the parties, quote, to engage in a feudal act simply to bolster a litigation position, as was recognized by the 7th Circuit and Bob Willows Motors in 1999. Have we addressed this in the California Federal Bank? The, in terms of the most recent CalFed opinion, there the claim of the bank was that it would have retained its 24,000 single-family arm loans. It would not have sold them absent a breach. It had, that was a specific investment, a specific claim that it had. This is to the thrift at large. But isn't that the problem here, that you, you, you, sort of a failure of proof to establish that there was a, the breach caused lost profits. You're making general statements, but you haven't identified any, any, any evidentiary basis to conclude that the breach resulted in the lost profits. The, let me, even the, the Winsor-Tropwood decisions that were relied upon by the trial court here, and where the reasons are being recited by the government, reject the requirement that you have to show the specific borrowers to whom you would have made loans to earn the profits. All you need is some indication of how the assets would be deployed, categories, types, or even the buckets. And that's exactly the evidence that citizens presented at trial and the court overlooked because it applied the wrong standard. It was doing a traditional savings and loan business, and that was value-restricted because of the breach, taking in redel deposits and investing its funds in two buckets, single-family mortgage loans and mortgage related securities. Its investment policies were the same before and after the breach. It had consistent conservative investment philosophy, and that was cited at Citizens Group 22 to 24, and the reply at 18. The two categories are laid out clearly at Appendix 201, 1971 through 74. Simply, citizens would have expanded those two categories. This is not the case of a, of a CalFed or other high-flying thrift that the question is whether, whether they would have invested in commercial real estate, commercial loans, consumer loans. This was a plain vanilla thrift in the skies and scope of its business was restricted because of the breach. It had immediate market opportunities as demonstrated by the peer growth of five to seven percent. Again, the five percent peer growth was the peer study endorsed by the government's own experts. Citizens had built-in growth as a thrift because of the interest that's credited on deposits. One to three percent, and that's, would roll over and you would have an automatic expansion, and that's in the record at 8100141 and 8101685. In fact, citizens could have simply purchased larger quantities of the same investment securities. How did you prove that, though, that I'm looking at the district, the Court of Federal Claims opinion, and they're saying over and over again they fail for lack of proof. There's no proof that you didn't invest because of the breach. The court looked, the court essentially set up strong, well, you didn't prove to me that you would have actually made this RTC acquisition, or you didn't prove that you would have done a specific transaction. How did you prove it other than by having your experts say, well, the growth rate was this and we didn't achieve it, so it must have been stopped by the breach? We showed what their citizens had a long history of growth. They grew before the breach. The business plans before the breach study has continued to grow. The breach interrupted that normal growth of at least five percent. It stopped growing for four years. It shrunk in 1989. Its peers and competitors continued to grow, doing the normal business. What the court did was look, okay, you haven't shown me this larger growth with the ten percent capital ratio, and looked over here, you haven't shown me that you would have made a specific RTC acquisition or done a specific transaction, but the court missed the 800 elephants staring right in the front, and that's how we established the lost profits in the court of reluctance. You want to preserve your rebuttal time? I will. Thank you, Mr. Evans. May it please the court. Citizens challenge nearly every legal standard and every factual finding made by the trial court in this case. As this court is well aware, a clear error standard applies to the trial court's findings of fact, which is an exacting standard, challenging an How can you prove something that didn't happen? They're being asked to show that they didn't invest here, they didn't invest there. Well, of course they didn't. They didn't have the funds to invest. Well, your honor, I believe it's not an instance that the trial court required plaintiffs, citizens in this case, to prove a negative. What the court did was look at what the plans it had in place. In fact, citizens did not produce the business plans for the years immediately prior to FIREA. The only indication we have of their planned growth was from a regulator's work paper, which indicated that they had planned growth in 1989 of 4%, in 1990 of 4%, in 1991 of 5%. In fact, they did not meet their asset goal growth in 1989, not because of FIREA. The evidence admitted at trial, the specific contemporaneous documents, indicated that their CFO, Mr. Stevens, told the regulators that in 1989, this is the examination in August 7, 1989, they were not going to meet their asset goal because of the negative publicity of the savings and loan industry, a robust stock market, and the shape of the yield curve. Nothing about the fact that they weren't going to have goodwill because of FIREA. The court also made a factual finding that following FIREA in 1990, the thrift actually grew 3.5% when it was anticipated or planned growth of 4%. To the extent that the thrift did not grow after that, the court made factual findings that any lack of growth was not due to concerns for inadequate capital. Citizens attempt to claim that the trial court made a factual finding that citizens was not entitled to its capital cushion. The court made no such finding. The court, in fact, noted that they did operate with a significant capital cushion and said that they were entitled to a capital cushion. And there's no debate about the fact that once FIREA was enacted, citizens met all of its capital requirements. In fact, in 1989, when FIREA was implemented, citizens met the fully phased-in requirements that weren't necessary to meet until 1994. Citizens had considerable capital following the passage of FIREA, and they still did not leverage that capital to grow. The trial court made a factual finding that there was no concern or that concerns about their regulatory capital did not prevent them from growing following FIREA. In fact, the trial court made credibility determinations in this regard, too. It did not find the testimony of Thomas Prisby, the chairman of the Board of Citizens, to be credible in terms of his concern that the regulators were going to shut them down for lack of capital. In fact, the court credited the testimony of the government regulators, which said that citizens was an excellent thrift. In fact, it required very little supervision. And by 1991 and 1992, actually, citizens had three times the amount of capital required. The court made factual findings in this case as to citizens' claims of a 10 percent capital goal. Now, citizens would like to minimize the effect of the trial court's factual finding in this regard. However, it's significant. They claim that, oh, it was merely an input into Dr. Horvitz's expert reporter, his model. It was not. It was the very foundation and cornerstone of their lost profits claim. In fact, they claimed that, well, we were trying to obtain a 10 percent level of regulatory capital and that when FIREA took the goodwill away, we couldn't grow again until we were back to that 10 percent regulatory capital figure. The trial court made a factual finding that no such capital goal existed. It did so because there was not a single contemporaneous document in any of the evidence submitted trial to indicate that such a goal existed. In fact, the only goals that were reflected in any contemporaneous documents admitted into evidence were, in fact, gap capital or tangible capital goals, neither of which were affected by the phase out of goodwill. So the court's factual finding that there was no 10 percent capital goal goes to the very heart of their claim that they couldn't grow because they couldn't get back to this 10 percent capital figure. And it's not just that it's an input into Dr. Horvitz's model. As far as causation is concerned, Citizens claims that the court got it wrong in terms of the standard applied. However, the court applied this court's case, recent decision in CALFED, which indicated that more than a substantial factor is required. In fact, that the damages plaintiffs must show that the breach produced damages inevitably and naturally and not just so far as the claim that the trial court imposed some sort of heavy burden on it in order to demonstrate that causation. That certainly is not the case. The court was making reference to this court's decisions in Glendale and CALFED, which had indicated that lost profits had proven to be a difficult claim for plaintiffs in the Winstar cases to prove. The trial court, Citizens claims that the trial court somehow found that leverage was not valuable and that the goodwill had no value. Certainly, the trial court made no such findings. The trial court, in fact, noted that leverage has a potential for value to the extent that there are opportunities in which the thrift can invest and earn profits. Leverage only gives rise to potential profits. Citizens claim in this case is similar to that of plaintiffs in the Granite management case in which this court issued a decision last year. In fact, following FIREA, Granite in that case never attempted to raise or replace the lost goodwill. Granite claimed that the trial court held as a matter of law that the thrift suffered no damage whatever from the loss of over a quarter of a billion dollars in contractually guaranteed capital or goodwill. This court responded that no, the trial court did not hold that the government's breach of contract caused Granite no damage, but held only the far different point that Granite had failed to prove its damages. That's exactly what occurred in this instance, Your Honor. The plaintiff in this case failed to prove that, in fact, it could not grow and that it lost lost profits. In fact, as far as the plaintiff's expert in this case, Dr. Horvitz was all over the board. He said, well, they could have acquired RTC acquisitions. They could have acquired another thrift. They could have just bought more mortgage-backed securities in the same proportions that they would have. He also testified, well, they could have had different proportions. There was no reasonably certain measure of damages in this case, and in fact, the court found that Dr. Horvitz's model was fatally flawed for just those reasons. In fact, the court focused on four specific reasons. The court found that the model was based on an unsupported assumption that the court had made a factual finding that the 10% regulatory capital did not exist. Also, the court's assumptions as to growth in the model were speculative and not supported by the contemporaneous documents. As the court had indicated, the plaintiff would like the growth anticipated by Dr. Horvitz's model was only 7%. Well, that's if you take it all the way back to basically 1988 through the 1993 timeframe. In fact, the amount of growth anticipated by Dr. Horvitz's model in the first year, in 1990, following FIRA was 16.5%, and it was almost 11% the year after that. Citizens never grew at that rate. They never had that double-digit kind of growth in their business plans. Now, when asked about this at trial, their officer said, well, we only put 4% or 5% in our business plans because we didn't want to be criticized by the regulators for excessive growth. The fact is the contemporaneous documents did not support the kind of modeling or assumptions, as far as growth was concerned, that plaintiff's expert had in this model. Mr. Evans, what is the applicability or distinction, this case and the home savings case? Your Honor, the home savings case is significantly different. In home savings, the thrift operated with a capital cushion of between 2% and 2.5%. Following FIRA, the thrift actually raised capital on five different occasions, and the trial court found that the purpose of those capital raisings, at least in part, was to make up for the lost goodwill, and in fact awarded the court its costs associated with those capital raisings. Are you saying in this case, for example, if citizens had gone out and attempted to raise capital to bring up its capital reserves up to the 10% level that they discussed, that perhaps the cost of raising those funds could have been asserted as a damage resulting from the breach? Yes, it could have, Your Honor, that plaintiffs could have brought that type of claim, which was the claim basically that the thrift in CalFed brought, which was that they needed to raise capital, replace the lost supervisory goodwill, and I believe in that case they were awarded $23.5 million for the transaction costs associated with raising that capital. That was not the case here. Citizens had numerous damage claims. They had cost of replacement capital claims that were had restitution and reliance damages claims for the net liabilities assumed, again, which this court has rejected numerous occasions. They also had another reliance damages claim that on the eve of trial they abandoned two months prior to trial, which left them with the lost profits claim of nearly $21 million predicated on the model that Horowitz had submitted. In contrast to home savings, and one of the things that the home savings court, in fact, the Federal Circuit noted was that the thrift in home savings was not attempting to recover profits based on the leverage of that goodwill. It was merely attempting to replace the costs associated with actually raising that capital, and I think that thrifts that have brought those types of claims have been successful in the WinStar arena because the court has focused on the actual costs associated with replacing that goodwill. All of the hypothetical models, I believe, have been rejected by this court. That was not citizens' claim in this case. And two other reasons why the court made factual findings as to why Dr. Horowitz's model was not reasonably certain is that he assumed without support that profitable opportunities were available and that there was no evidence regarding the foregone assets. In fact, their own documents admitted into evidence indicated, and this was in 1992, that they were having difficulty finding investments at the normal spreads. This was in one of their board of directors' minutes. Their documents also indicated that they did not need capital. In 1993, Thomas Prisby told a regulator, and this is again one of the regulator's work papers that was admitted into evidence, that we're not contemplating conversion because we don't need the capital. They had plenty of capital. They just lacked for opportunities to deploy that capital profitably. The fourth problem with Dr. Horowitz's model and the reason why the court rejected it as not being reasonably certain is that because it was contrary to basic economic principles. It was fundamentally flawed because it assumed that the thrift could grow as much as possible and there would be constant return on investments. And in fact, it would constantly make 1.1 percent return on any and all investments that made, regardless whether it was mortgage-backed securities, regardless whether it had tried to acquire other thrifts or RTC acquisitions. And as Dr. Horowitz testified at trial, well, they could have acquired RTC acquisitions. Well, as we presented at trial, the evidence showed that of all the RTC thrifts that were available, RTC assets that were available in northern Indiana during these years, there were only four RTC acquisitions and only one of them in the area in which Citizens operated. And in fact, that was only a $7 million institution. The evidence also indicated that Citizens had tried to expand into Illinois prior to the breach in 1988. There were documents, contemporaneous documents, indicating that they attempted to expand into Illinois, that those expansion plans were not plans to expand into Illinois. And again, these were contemporaneous documents that were admitted into evidence that formed the basis for the trial court's factual findings, that there were indeed no lost opportunities here, that Citizens was not able to take advantage of because of the loss of goodwill. Citizens asked that the case be remanded for the trial court to make some sort of jury verdict award to be made. A jury verdict is not utilized unless clear proof of injury exists. And the trial court has made factual findings that, in fact, no clear proof of injury does exist. And in fact, the factual findings of the trial court would have to be reversed in order to have a jury verdict in this instance. Your Honor, the trial lasted a month. Your Honor, the trial lasted a month. It was four weeks. Plaintiffs had 43 hours to put on the case. Reverend, I think your time has expired. Thank you, Your Honor. For the reasons in our brief and those stated here, we ask that the Court confirm the decision of the trial court. Thank you. Mr. Scania? Most of the facts referred to by the government were not the basis for the Court's decision below, and therefore, it would require this Court to engage in fact-finding in order to support the decision below. But more importantly, the Court made no findings, and this is why the Court's independent business decisions rationale is legal, Eric. It made no findings, and the government never proved that other factors served as an intervening cause for citizens' lack of the normal internal 4 to 5 percent growth. There was nothing. The Court never found that citizens would have stopped growing absent the breach. This was a massive disruption in citizens' business and hostile regulatory environments where 30 percent of the industry had just failed. It forced citizens to adopt the no-growth strategy, and it stopped growing for that reason. There was no finding to the contrary for that type of growth. A judgment in terms of home savings. Home savings is directly applicable here because the Court below—home savings by the Federal Circuit came out after the decision below. The decision below made repeated undue emphasis on citizens' post-breach capital compliance. All of that is irrelevant under home savings because the decision to maintain a capital cushion absent the—following the breach is not an independent business decision, and that's what citizens did. In fact, during 1990 and 1991, citizens' capital was deemed marginal by the regulators and admitted by the government, yet there are no damages awarded for this time period. Citizens' capital ratios, this cushion was below the peers, below the peers group sponsored by the government, and the government's own expert admitted that per se, if you're below the peers, that is unreasonable. But in home savings, there was no claim for loss of leverage, was there? No, but the principle is the same in terms of whether citizens had sufficient or insufficient capital. It had insufficient capital to grow, and that leads to another error that the Court made below. But this is a different claim, different issue, different series, or different—requires different sets of proof, and that gets us back to the evidentiary record here and the repeated findings that there was a failure of proof. The citizens presented, Professor Horvitz, that citizens could have grown strongly by maintaining its 10 percent capital cushion and growing above that. Alternatively, Professor Horvitz testified and the witnesses testified, they would have grown at least by its past performance of 5 percent, which is what the peers did by that amount. The government's expert admitted citizens were so good at earning money doing its plain, vanilla business, and that business was directly interrupted by the cause of the breach. And for that—that should be the basis for a reversal here. We ask for reversal and causation when instructions are asked to reasonable certainty in terms of the fair and reasonable approximation standard to apply, and at least a jury verdict to be mandated. Thank you. Thank you, Mr. Scantio. Our next case is consolidated.